**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | **CIVIL ACTION** |
| ) | |
| v. ) | No.  04-10242-MLB |
| ) | |
| SCOTT ALLAN MORIN, and ) | |
| NANCY GAILE MORIN, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM AND ORDER**

**I.   INTRODUCTION**

This case comes before the court on defendant Scott Morin's motion to suppress evidence. (Doc. 20.)  Defendant Nancy Morin joins this motion.  (Doc. 22.)  The matter has been fully briefed, and the court conducted an evidentiary hearing on February 28, 2005.  (Docs. 21, 23.)  Defendants' motion is GRANTED for reasons set forth herein.

**II.  FACTS**

Most of the facts in this matter are not in dispute.  However, the critical facts on which this motion turns are hotly contested. Defendants live at 211 Elmwood Drive in Pittsburg, Kansas. Sometime during the summer of 2002, Detective Lieutenant Stuart Hite, of the Crawford County Sheriff's Department, received an anonymous tip that the Morins were receiving some 15 or so visitors per day at their home, at all hours of the day and night, and that the visitors stayed no more than 10 to 15 minutes at a time.  The caller suggested, and Hite agreed, that such a traffic pattern could be indicative of drug distribution activity.   Nonetheless,   Hite  gave  no  serious

consideration to the call, noting that sometimes such anonymous calls were not legitimate.  Instead, he testified that he occasionally receives fabricated stories from anonymous tipsters who are seeking to retaliate against other individuals.  At least partly on that basis, Hite decided to do nothing with the case until he received some sort of corroborating information.  Moreover, no investigation was initiated.

Hite testified that over the following five or six months, he received two or three more anonymous tips to the same effect.  He believes that they may have all come from the same source; however, he made no notes regarding any of the calls.  Finally, sometime on or before the ninth of January, 2003, Hite received the last of these anonymous tips.  He testified that thereafter, while driving eastbound on Quincy Street in Pittsburg, he happened to look to the north as he passed Elmwood Drive.  From that vantage point, as he passed through the intersection, he was able to catch a glimpse of the Morins' trash cart placed near the curb in front of their home, which was the third house north of Quincy on Elmwood.  (Def's exh. A.)  With respect to the date and time that he noted the trash cart's location, Hite specifically testified that, "I believe" it was on January 9, 2003. He claims it was late in the day, but prior to the time he completed his shift, which was 5:00 P.M.  He further testified that it was definitely during daylight hours.

Hite claims that after noting that the Morins' trash cart was down by the curb, he telephoned Special Agent Shawn Campiti with the Kansas Bureau of Investigation's Drug Task Force in Crawford County. Hite asked Campiti if the latter could perform a "trash pull" during

the nighttime hours. A "trash pull" apparently refers to the law enforcement practice of obtaining garbage from a suspect after that garbage has been placed by the curb or otherwise placed for disposal.

Campiti testified that he and Drug Task Force member Ronald Light performed the trash pull on the evening of January 9, 2003, between the hours of 10:30 P.M. and midnight. While dressed in plain clothes, the officers approached the Morin residence in Light's pickup truck. Noting that the trash cart was full, the officers decided to grab the entire cart, which they placed in the back of the truck. Then they drove one or two blocks away, dumped the trash in the bed of the pickup, and returned the trash cart to the curb in front of the Morin residence. Light testified that among other reasons, they took the cart to ensure that any noise associated with emptying its contents would not alert the defendants to the police activity.

Campiti testified that the two officers took the trash to the KBI field office in Pittsburg, where they sorted it to look for evidence. During the search, they discovered several pieces of aluminum foil with a burnt residue on them. Campiti testified that pieces of aluminum of that shape are called "slides," and are used to smoke methamphetamine. Subsequent testing by a KBI laboratory confirmed that the residue contained methamphetamine. Campiti also found pieces of mail addressed to the Morins.

Based on the evidence found in the trash, along with the anonymous tips, Hite applied for and obtained a state warrant to search defendants' home. There the officers found twelve grams of methamphetamine, a set of digital scales, and various drug paraphernalia. Based on those findings, defendants were indicted in

-3-

this case on November 17, 2004, some 21 months after the seizure of the evidence.

In stark contrast to the officers' testimony, the defendants maintain that their trash cart was not by the curb. Instead, they assert that it was tucked in behind their home, more than 100 feet from the nearest public access point. Scott Morin testified, and the government conceded, that trash pickup day for the Morins was ordinarily on Wednesdays. Scott Morin further testified that he always put his trash out on Tuesday evening, and that the garbage disposal company would pick it up early Wednesday morning, after which he would quickly return the cart to its location behind his home.

During the week in question, the Morins trash would have been picked up on Wednesday, January 8, 2003. Thus, it would have been defendants' ordinary practice to put the cart by the curb on the evening of January 7, and return it to its location behind their home on the morning of January 8. Scott Morin unequivocally testified that his trash cart was not at curbside on January 9, 2003 and that, thus, when the officers took his trash cart, they must have taken it from its place behind his home.

In further support of their version of the facts, defendants offered the testimony of their neighbor, Shawn Packard. Packard is a lifelong resident of his home at 204 Elmwood Drive, just three houses north of the Morin home, and on the opposite side of the street. Packard testified that he is disabled, spends a great deal of time at home, and keeps track of activity in the neighborhood. He corroborated defendants' story that trash is picked up on Wednesday for their neighborhood. He further testified that it would have been

highly unusual for the Morins' trash cart to be curbside on January 9 or 10, and that he would have noted it.  Finally, he stated in unequivocal terms that the Morin's trash cart was not left out on January 8, 2003, and that it was not out on January 9 or 10.  On cross-examination, he further testified that he knew the Morins only as neighbors, and did not interact with them socially or on any other level.

Finally, the parties entered into a stipulation as to what the testimony of Irene Eisenhart would be.  Eisenhart lives at 210 Elmwood Drive, directly across the street from the Morins.  She has lived there for many years, and defendants' driveway is visible from her home.  Eisenhart confirmed that her trash and the Morins' trash is picked up on Wednesdays.  She also stated, "I have no recollection of the Morin's [sic] trash being at the curb on either the 9th or 10th of January.  If Mr. Morin's trash had been by the curb on the 9th or 10th of January, 2003, I [would] have noticed and I would remember because it would have been completely out of the ordinary."

### III.  ANALYSIS

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  In furtherance of that protection, warrantless searches are presumptively unreasonable, absent a few well-defined exceptions, so long as the individual challenging the search maintained a reasonable expectation of privacy in the place or thing subjected to the search.  <u>California v. Greenwood</u>, 486 U.S. 35, 39, 108 S. Ct. 1625, 1628, 100 L. Ed. 2d 30 (1988).  With respect to garbage and trash containers, the law

recognizes a reasonable expectation of privacy when the trash is retained within the curtilage of the home. United States v. Long, 176 F.3d 1304, 1307 (10th Cir. 1999). However, once garbage is removed from the curtilage and placed for disposal, the expectation of privacy evaporates, and the trash may be rummaged through by the garbage company, neighbors, vagrants, and law enforcement officers. Greenwood, 468 U.S. at 40-41, 108 S. Ct. at 1628-29. No warrant is required.

The parties agree that this motion turns on a factual issue - where was the trash cart located when the officers took it? (Docs. 21 at 11; 23 at 5-6.) If it was behind the Morins' house, the government essentially concedes that the trash cart was within the curtilage of the home, making the warrantless search unlawful. (Doc. 23 at 5-6.) Since evidence obtained from the trash cart was essential to obtaining the warrant, if the search of the trash cart was unlawful, then the evidence obtained pursuant to the warrant must be suppressed as fruits of an illegal search. Wong Sun v. United States, 371 U.S. 471, 484-86, 83 S. Ct. 407, 416, 9 L. Ed. 2d 441 (1963).

While the defendant normally bears the burden of proving that a search pursuant to a warrant was unlawful, United States v. Carhee, 27 F.3d 1493, 1496 (10th Cir. 1994), the government bears the burdening of proving that a warrantless search was legitimate. United States v. Zubia-Melendez, 263 F.3d 1155, 1160 (10th Cir. 2001). Since the validity of the search warrant turns on the lawfulness of the "trash pull," the initial burden rests with the government to prove that a warrant was not required to search the trash cart.

This case presents a difficult decision for the court. On the

one hand, the government presented the testimony of three law enforcement officers who claim the trash cart was at the curb on January 9, 2003.  By contrast, defendant presented the testimony of two disinterested witnesses who say that the trash cart was not curbside on January 9.  While the consistency of the story presented by the law enforcement officers weighs in favor of the government, they all have an interest in the case. Conversely, the government had an opportunity to cross-examine Mr. Packard, but failed to show any bias or favoritism toward defendants, or provide any other reason why his testimony should not be believed.  Likewise, the government stipulated to the testimony of Ms. Eisenhart, who lives directly across the street from defendants.  Although the government did not stipulate to the <u>accuracy</u> of Ms. Eisenhart's testimony, the stipulation represents a decision to forego cross-examination. Therefore, the court has no basis to doubt the credibility of Ms. Eisenhart's unequivocal statements.

Coupled with the clash between the consistency of the officers' testimony and that of the defendants' disinterested witnesses, is the curious fact that the government claims defendants' trash cart was curbside on a day when all agree that trash was not scheduled to be picked up.  In fact, the garbage would not be collected for another six days.  This does not make much sense. Scott Morin testified that he and his wife were daily users of methamphetamine in January 2003. Thus, one possible explanation is that the defendants were stoned on methamphetamine and put the trash out on the wrong day; but that is mostly speculation.  Another possibility would be that on this occasion, defendants broke their ordinary practice of returning their

trash cart to its location behind their home and instead left it at the curb an extra day.  That scenario would have required defendants to walk some 100 feet down to the road to place trash bags in the cart without bothering to drag the cart back up the driveway.  Again, there is no evidence to support such a scenario.  Finally, the court notes that Detective Hite became somewhat equivocal regarding the date he saw the trash cart near the street.  During his testimony, he specifically qualified his statement regarding the date he saw that cart with the words "I believe" it was January 9, 2003.

Based on these findings, the court concludes that the government has failed to meet its burden to show that the trash cart was curbside when the officers seized it.  Accordingly, the warrantless search of the cart was unlawful.  While this result is troubling, especially in light of the fact that the search of defendants' home revealed methamphetamine, the Supreme Court has repeatedly emphasized the point that the Fourth Amendment's protections against warrantless searches are at their highest in the home.  See Maryland v. Garrison, 480 U.S. 79, 90-91, 107 S. Ct. 1013, 1020, 94 L. Ed. 2d 72 (1987) (collecting cases).  Likewise, heightened protection extends to the curtilage. Long, 176 F.3d at 1307-08.  In order to overcome the presumption of unreasonableness that attaches to warrantless searches, the government has to do a better job than has been done here.  The officers involved in this investigation have no contemporaneous notes or reports to memorialize the accuracy of their recollection, especially with regard to the dates involved.  Although that might not ordinarily be required, when a defendant produces the sort of unequivocal evidence from credible, disinterested witnesses that has been introduced in

this case, the government has to do more to overcome that evidence in order to meet its burden.  That did not happen.  Defendants' motion is GRANTED, and all evidence seized from the trash and during the subsequent search of defendants' home must therefore be suppressed.

A motion for reconsideration is neither invited nor encouraged. Any such motion shall not exceed three double-spaced pages and shall strictly comply with the standards enunciated by this court in <u>Comeau v. Rupp</u>, 810 F. Supp. 1172, 1174 (D. Kan. 1992).  The response to any motion for reconsideration shall not exceed three double-spaced pages. No reply shall be filed.

IT IS SO ORDERED.

Dated this __4th__ day of March 2005, at Wichita, Kansas.

s/   Monti Belot

Monti L. Belot

UNITED STATES DISTRICT JUDGE